# United States Court of Appeals
## For the First Circuit

No. 08-1152

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721,
NAMED "FLASH II",

Defendant in Rem.

_____

KERRY SCOTT LANE,

Claimant, Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

_____

Before

Lynch, Chief Judge,
Selya, Circuit Judge, and
Schwarzer,* District Judge.

_____

Brenda Grantland for appellant.
Anton P. Giedt, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

_____

*Of the Northern District of California, sitting by
designation.

October 20, 2008

**SELYA**, **Circuit Judge**. The instant appeal requires us to revisit the FLASH II, a sailing vessel once owned by the late John F. Kennedy. This time around, the district court found that the government had failed to take reasonable steps to notify a part-owner of the vessel (Dr. Kerry Scott Lane) of its intent to forfeit. Since the government already had sold the vessel at auction, the court — which determined that the sales price equalled the vessel's fair market value — awarded a share of the net sales proceeds to Lane. It subsequently granted him attorneys' fees in an amount less than he had requested.

Lane appeals, challenging both the damages and fee awards. The damages issues are case-specific, but the issues as to fees are of potentially broader significance. After careful consideration of these issues against the backdrop of a tangled record, we affirm the damages award but modify the fee award.

## I. BACKGROUND

We sketch the facts and procedural history in order to place the issues into a workable perspective. In doing so, we assume the reader's familiarity with our earlier opinion. See United States v. One Star Class Sloop Sailboat (Sloop I), 458 F.3d 16 (1st Cir. 2006).

On February 1, 2005, the government filed a civil forfeiture complaint against the FLASH II, charging that the vessel comprised the avails of narcotics trafficking. After finding

-3-

probable cause to forfeit, the district court ordered the government to notify those persons who arguably had an interest in the FLASH II about the pendency of the action. Only one individual, Harry Crosby, lodged a claim of interest. For reasons that are no longer important, the government did not provide notice to Lane.

On June 3, 2005, the clerk of the district court, acting pursuant to a government motion, entered a default against all interested parties who had received notice and had not responded thereto. See Fed. R. Civ. P. 55(a). Crosby and the government subsequently negotiated a settlement that contemplated the eventual sale of the vessel. On July 15, 2005, the district court endorsed that settlement and entered a default judgment of forfeiture.

Although Lane had learned of the seizure shortly after it transpired, he did not look into it. He became aware of the forfeiture proceeding only after the entry of default. He secured counsel; moved unsuccessfully to vacate or amend the default judgment, see Fed. R. Civ. P. 59(e), 60(b); and then appealed.

Lane asked the district court to stay the forthcoming forfeiture sale pending resolution of his appeal. The court refused to do so. The government proceeded to sell the FLASH II for $100,000 through Guernsey's (an auction house in New York). Crosby received one-third of the net proceeds and the government received the balance.

-4-

We decided Lane's original appeal in August of 2006, remanding to the district court to determine whether Lane had been afforded constitutionally adequate notice of the forfeiture proceeding. See Sloop I, 458 F.3d at 25-26. On remand, the case was reassigned to a different district judge. See D. Mass. R. 40.1(K)(2).

The new judge ruled that the government had not taken reasonable steps to discover Lane's proprietary interest in the vessel and, thus, had given inadequate notice of the forfeiture proceeding. In re One Star Class Sloop Sailboat (Sloop II), 517 F. Supp. 2d 546, 549 (D. Mass. 2007). Consequently, the judge vacated the default judgment. Id.

In due course, Lane and the government cross-moved for summary judgment. These motions focused chiefly upon the forfeitability of the FLASH II and its value. The parties submitted various materials related to value, including evidence of earlier bids and appraisals and an affidavit signed by Guernsey's president, Arlan Ettinger. On May 15, 2007, the district court tentatively granted the government's motion for partial summary judgment, ruling that as long as the vessel had been properly forfeited sovereign immunity barred the recovery of any sum in excess of $100,000.

On May 24, the court held a single-day bench trial, which focused principally upon the issues of (i) forfeitability and (ii)

the validity and scope Lane's asserted ownership interest. At the end of the day, the court reserved decision, set a briefing schedule, and reminded the parties of the approaching deadline for the completion of discovery.

The briefs arrived on time. Relatedly, Lane requested reconsideration of the earlier (tentative) ruling on sovereign immunity. In the same time frame, the government proffered transcripts of the depositions of Ettinger and Robert Augustus Harper (an attorney who had represented another investor in the FLASH II).

On October 1, 2007, the district court handed down a comprehensive rescript, in which it concluded that the FLASH II was not forfeitable; that the vessel had a fair market value of $100,000 at the time of its seizure; and that Lane should receive his pro rata share of that sum. See Sloop II, 517 F. Supp. 2d at 554-56. The court also pointed out that, given its finding on fair market value, the sovereign immunity issue had become moot. Id. at 556.

In a supplemental ruling, the district court found that Crosby had a valid interest at least equal to the amount ($26,101.24) that he had received under his earlier settlement and awarded Lane the balance of the $100,000 fair market value figure (i.e., $73,898.76), together with post-seizure interest. Finally, the court indicated that Lane, as a prevailing party, was entitled

to reasonable attorneys' fees under the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), 28 U.S.C. § 2465(b)(1).

Lane applied for approximately $293,000 in fees.[1] The government vigorously contested the amount. The district court agreed that the request was exorbitant and awarded $51,929.13. See United States v. One Star Class Sloop Sailboat (Sloop III), No. 05-10192, 2008 WL 678519, at *2 (D. Mass. Jan. 9, 2008). This timely appeal ensued.

## II. ANALYSIS

Lane characterizes both the damages and fee awards as inadequate. We address them separately.

### A. Damages.

As said, the lower court found that the fair market value of the FLASH II was $100,000, and awarded Lane his pro rata share of that amount. See Sloop II, 517 F. Supp. 2d at 556. On appeal Lane concedes that he is entitled only to his share of fair market value and does not challenge the court's proration as such. He contends, however, that the court erred in valuing the FLASH II at $100,000. His contention rests on two pillars, one procedural and one substantive.

1. **The Procedural Pillar**. Lane claims that the district court determined the value of the FLASH II prematurely, that is,

---

[1] Both Lane's application and the district court's award include expenses as well as fees. For ease in exposition, we use the term "fees" as a shorthand for both fees and expenses.

before affording him an opportunity to submit relevant evidence. The theoretical underpinnings of this claim are sound: under normal circumstances, a party must be afforded a fair chance to submit evidence and arguments in favor of his position before a final judgment is rendered. See EEOC v. S.S. Clerks Union, Local 1066, 48 F.3d 594, 609 (1st Cir. 1995). But due process does not necessarily "require a full-scale trial, or even a hearing strictly conforming to the rules of evidence" on every issue. In re Nineteen Appeals, 982 F.2d 603, 611 (1st Cir. 1992); see Aoude v. Mobil Oil Corp., 862 F.2d 890, 894 (1st Cir. 1988) (holding that preliminary injunction motion may be heard "on the papers," provided that parties have had "a fair opportunity to present relevant facts and arguments to the court"). Moreover, when the parties consent to proceed in a particular manner (such as through written submissions), courts understandably are reluctant to give the loser a second bite at the apple on the ground that the agreed process was insufficient. See, e.g., Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1120 (1st Cir. 1989).

The court below found the fair market value of the FLASH II without an evidentiary hearing devoted to that issue. Nevertheless, the court provided the parties with ample opportunity to present valuation evidence. The chronology follows.

The parties identified valuation as a key issue in a joint statement submitted shortly after vacation of the default

judgment.  See D. Mass. R. 16.3(b).  In their cross-motions for summary judgment, both sides contested valuation and submitted documents to support their respective positions.  For example, Lane pointed out that the FLASH II had received a high bid of $800,000 during an aborted 1998 auction and that Guernsey's had appraised the vessel at $800,000 to $1,000,000 in 2004.  He also argued that the 2005 auction occurred under adverse conditions.  For its part, the government proffered an affidavit from Guernsey's president, Ettinger, discussing the reasons for the munificent bid in 1998 and for Guernsey's original appraisal.  Ettinger also opined that the 2005 auction had taken place under favorable conditions.

The short of it is that the district court received a substantial number of evidentiary submissions relating to the vessel's value.  Lane contributed to that influx of information and consented to submitting the valuation issue on the papers.  In view of these facts and because the issue was susceptible to adequate documentary proof, we discern no procedural bevue in the district court's approach.

In an effort to blunt the force of this reasoning, Lane complains that the court's ruling of May 15, 2007 — to the effect that sovereign immunity barred any recovery in excess of $100,000 — pretermitted the presentation of valuation evidence.  The record belies this plaint.  In terms, the May 15 ruling was tentative. Importantly, it made pellucid that Lane could recover the vessel's

actual value if the court later determined that the FLASH II was not lawfully forfeited. The court reiterated that message on at least two occasions during the bench trial. Thus, Lane had both the incentive and the opportunity to put forth his valuation evidence.

Lane suggests that the Ettinger deposition and a deposition given by Crosby yielded relevant evidence of fair market value, which he would have proffered had the valuation issue been tried. That suggestion is doubly flawed. For one thing, Lane fails to explain why he did not submit this evidence when he had the chance. For another thing, Lane fails to identify any specific facts not before the district court at the time of its decision on value that might have affected the court's determination.[2] The latter failure, in itself, renders Lane's suggestion futile. See Kelly v. Marcantonio, 187 F.3d 192, 203 (1st Cir. 1999); see also HMG Prop. Investors, Inc. v. Parque Indus. Rio Canas, Inc., 847 F.2d 908, 915 (1st Cir. 1988) (holding that it is not error to deny oral argument where complaining party fails to identify even a "single, definable aspect of its position which could not have been adequately presented by a written submission").

---

[2] With the exception of Crosby's deposition, all the evidence mentioned by Lane was before the district court at the time the court ruled. We have reviewed Crosby's deposition and find that it contains no material pertinent to the valuation question other than Crosby's recitation that the vessel had received bids of up to $800,000 during an earlier (failed) auction. This information was already before the court through other deponents.

If more were needed — and we doubt that it is — at the close of the bench trial the court reminded Lane that he had a limited time left within which to conclude discovery, including discovery directed to valuation.[3] The court mused that it might convene a further evidentiary hearing on valuation. At that point, Lane indicated that such a hearing was unnecessary because the valuation question could be adjudicated on the papers. This was a waiver, pure and simple. See, e.g., United States v. Jiménez, 512 F.3d 1, 7 (1st Cir. 2007).

That ends this aspect of the matter. Because the court below provided Lane an adequate opportunity to present valuation evidence through procedures to which Lane consented, his procedural attack is easily repulsed.[4]

**2.    The Substantive Pillar**. We come now to the substantive component of Lane's argument. In this regard, he

---

[3] This gentle prodding may have been lost on Lane, but it was not lost on the government. Following the bench trial, the parties conducted discovery relevant to the valuation issue, including the taking of Ettinger's deposition. In the supplemental brief that it submitted on June 29, 2007, the government relied heavily on the Ettinger deposition to argue that the fair market value of the FLASH II was $100,000.

[4] During oral argument in this court, Lane raised for the first time a claim that he was denied his right to trial by jury on valuation. We have been unable to find any hint in the record that Lane asserted such a right either before the district court or in his appellate briefs. In view of these omissions, we have no occasion to address the argument here. See Pratt v. United States, 129 F.3d 54, 62 (1st Cir. 1997); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

maintains that the evidence shows that the fair market value of the FLASH II far exceeds $100,000. We review the accuracy of the lower court's valuation finding for clear error. See McMurray v. C.I.R., 985 F.2d 36, 40 (1st Cir. 1993); see also Fed. R. Civ. P. 52(a)(6). Accordingly, we will override the court's valuation only if "on the whole of the evidence we reach the irresistible conclusion that a mistake has been made." Smith v. F.W. Morse & Co., 76 F.3d 413, 420 (1st Cir. 1996). If, however, "the district court's account of the evidence is plausible in light of the record viewed in its entirety," we must accept it. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).

We need not tarry. In the case at hand, the district court's valuation rested principally upon its conclusion that the 2005 auction was conducted under particularly auspicious circumstances. See Sloop II, 517 F. Supp. 2d at 551-52. The court observed that the government had contractually obligated itself (in the Crosby agreement) to sell the vessel at the highest possible price; hired Guernsey's, a reputable auction house, in an effort to fulfill that obligation; and tied Guernsey's commission to the price actually received. Id. at 552. The court then noted that the FLASH II was sold at an auction for Kennedy memorabilia that had received widespread publicity. Id. Given these favorable conditions, the court determined that the $100,000 price fetched at the auction reflected fair market value. See id.

Lane has identified several pieces of evidence that purportedly undermine this finding of fact. For example, he cites to negative publicity surrounding the FLASH II at the time of its sale, including a <u>Boston</u> <u>Globe</u> article reporting that the vessel was seized from a convicted narcotics trafficker and that Lane would likely appeal the default judgment. He also points to Ettinger's original estimate of the vessel's value ($800,000 to $1,000,000) and to certain communications between the government and Guernsey's. But all of this is simply whistling past the graveyard; whatever the persuasive force of these materials, they do not compel the conclusion that the FLASH II had a fair market value exceeding $100,000.

Despite the conflicting evidence, the district court had a solid basis on which to conclude that the auction of the FLASH II accurately captured its fair market value. The auction sale was conducted in a commercially reasonable manner, and the district court plausibly determined that the vessel sold for considerably less than earlier estimates because there had been a general decline in the price of Kennedy memorabilia. <u>Id.</u> No more was exigible. <u>See</u> <u>United States</u> v. <u>Mahone</u>, 453 F.3d 68, 73-74 (1st Cir. 2006) (upholding district court determination that item's selling price at auction reflected its fair market value).

Lane also argues that we should find as a matter of law that the FLASH II had a fair market value of at least $600,000.

His reasoning is somewhat convoluted. He begins with the notion that the government was obligated to obtain estimates from no fewer than three disinterested appraisers and to establish a minimum reserve price equal to at least two-thirds the average appraised value before carrying out an auction sale. This notion derives from Lane's reading of the Department of Justice publication, A Guide to Interlocutory Sales and Expedited Settlement (2003) (Guide), and his invocation of 28 U.S.C. §§ 2001(b) and 2004.

Lane's argument confuses plums with pomegranates. The sale of property forfeited to the United States is governed by 21 U.S.C. § 881(e). That statute provides in pertinent part that the Attorney General may "sell, by public sale or any other commercially feasible means, any forfeited property which is not required to be destroyed by law and which is not harmful to the public." 21 U.S.C. § 881(e)(1)(B). The record makes manifest that the 2005 auction constituted, at the very least, a commercially reasonable means of selling the FLASH II.

Lane's attempt to shift the focus to the Guide is unpersuasive. Because the government sold the vessel pursuant to a judgment of forfeiture entered on July 15, 2005, the Guide is inapposite.[5] And in all events, Lane has failed to explain how or

_____

[5] Lane maintains that the government could not reasonably have relied upon the validity of the judgment because it had provided constitutionally inadequate notice of the forfeiture proceeding. But the district court had denied Lane's motion for a stay, and Lane had not appealed that denial. Particularly given that

-14-

why the Department of Justice's internal guidelines regarding the interlocutory sale of assets give rise to a private right of action enforceable in the federal courts. See United States v. Henry, 482 F.3d 27, 33 (1st Cir. 2007) (holding that "Justice Department guidelines were not compelled by statute, nor intended to create private rights") (citation omitted).

Lane's endeavor to shift the statutory center of gravity is equally unavailing. Assuming arguendo that the strictures of 28 U.S.C. §§ 2001(b) and 2004 apply at all to the sale of forfeited assets — a matter on which we take no view — Lane has failed to demonstrate that the government transgressed either of these provisions.

The three-appraisal and reserve requirements of section 2001(b) apply to the judicial sale of personal property "unless the court orders otherwise." 28 U.S.C. § 2004. In this case, the district court "order[ed] otherwise"; its judgment directed the Marshals Service "to arrange for the sale of the [FLASH II] in accordance with United States Department of Justice policies regarding the disposition of forfeited property."

---

circumstance, we think that the government was entitled to rely upon the validity of the forfeiture judgment even though Lane had filed an appeal. See, e.g., Acevedo-García v. Vera-Monroig, 368 F.3d 49, 58 (1st Cir. 2004) ("The federal rules contemplate that, absent a stay, a victorious plaintiff may execute on the judgment even while an appeal of that judgment is pending.").

The relevant policies are embedded in the Department of Justice's <u>Asset Forfeiture Policy Manual</u> (2005). That manual provides in pertinent part that the Attorney General is empowered "to dispose of [forfeited] property however he or she deems suitable," <u>id.</u> at 86-87, because "forfeiture sales do not require judicial confirmation pursuant to 28 U.S.C. § 2001," <u>id.</u> at 85. As the district court ordered the Marshals Service to dispose of the FLASH II in accordance with policies that expressly disavow compliance with 28 U.S.C. § 2001, the three-appraisal and reserve requirements were not triggered. <u>See</u> 28 U.S.C. § 2004.

To conclude, we hold without serious question that the district court supportably found that the FLASH II had a fair market value of $100,000. We therefore uphold the district court's damages award.

### B. <u>Fees</u>.

The district court declared Lane, as a prevailing party, entitled to attorneys' fees under CAFRA's fee-shifting provision, 28 U.S.C. § 2465(b)(1). Lane asked for $293,591.42 in fees. Deeming this request excessive, the court awarded $51,929.13. <u>Sloop III</u>, 2008 WL 678519, at *2. Lane challenges the award as too meagre.

When fee-shifting is in prospect, "district judges have great discretion in deciding what claimed legal services should be compensated." <u>Brewster</u> v. <u>Dukakis</u>, 3 F.3d 488, 492 (1st Cir.

-16-

1993). Consequently, we generally review fee-shifting awards for abuse of discretion. See Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 335 (1st Cir. 2008). Lane suggests, without citation to any persuasive authority, that CAFRA fee awards may warrant a different standard of review. That argument lacks force. We have used abuse of discretion as the standard of review for fee awards under fee-shifting statutes that employ language similar to CAFRA's, see, e.g., DeJesús v. Banco Popular, 951 F.2d 3, 5 (1st Cir. 1991) (Truth-in-Lending Act), and we see no reason to employ a different standard here.

"[A]n abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 336 (1st Cir. 1997) (citation and internal quotation marks omitted). Within this rubric, "an error of law is always tantamount to an abuse of discretion." Torres-Rivera, 524 F.3d at 336.

None of this is to say that appellate review is a mere formality. Even though we respect a district court's superior coign of vantage, see Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001), we nonetheless take seriously our responsibility to assure that a fee award falls within the universe of acceptable outcomes.

-17-

Our starting point is familiar. Where fee-shifting under an open-ended statute is at issue, courts typically ascertain reasonable attorneys' fees by means of the lodestar method.[6] Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). That method entails "multiplying the number of hours productively spent by a reasonable hourly rate." Torres-Rivera, 524 F.3d at 336. In determining the number of hours productively spent, the court should "eliminate time that was unreasonably, unnecessarily, or inefficiently devoted to the case" and may, under appropriate circumstances, "disallow time spent in litigating failed claims." Id. (citations omitted). Reasonable hourly rates will vary depending on the nature of the work, the locality in which it is performed, the qualifications of the lawyers, and other criteria. See Gay Officers Action League, 247 F.3d at 295; see also United States v. Metro. Dist. Comm'n, 847 F.2d 12, 19-20 (1st Cir. 1988). Even after the basic lodestar is calculated, the court may adjust it, up or down, to reflect other considerations, such as the results obtained. Coutin, 124 F.3d at 337 & n.3.

In the case at bar, the district court wrote tersely. It seems to have performed a modified lodestar analysis. The time

---

[6] Lane's entitlement to fees arises under CAFRA. Because that statute does not explicitly dictate a method for calculating fees, the lodestar method constitutes the preferred approach. See United States v. Metro. Dist. Comm'n, 847 F.2d 12, 15 (1st Cir. 1988). As a necessary corollary, we are free to apply the vast body of precedents that have sprung up under an array of similarly configured federal fee-shifting statutes. See id.

-18-

sheets that Lane submitted showed work done by two lawyers (Brenda Grantland and Eric Goldberg) and a paralegal (Judy Osburn). The court determined that the legal team's efforts were largely unsuccessful; Lane was thwarted in most of the initiatives that he undertook and recovered only a fraction of the damages that he sought. Sloop III, 2008 WL 678519, at *1. Accordingly, the court disallowed everything related to issues that Lane had litigated and lost. Id.

The court proceeded to reduce by two-thirds the time claimed by Grantland in relation to removal of the default judgment.[7] Id. It then eliminated all of Goldberg's time. See id. The hours remaining after these excisions constituted the time reasonably spent. See id.

Turning from the multiplicand to the multiplier, the court concluded that Grantland's base hourly rate was what she normally charged in her home community and reduced that rate to account for "egregious overlitigation." Id. at *2. These and other determinations, not contested on appeal, yielded the amount of the award. In the pages that follow, we address Lane's principal arguments about where the district court supposedly went astray.

---

[7] The court stated at one point that it also would disregard two-thirds of the time relating to the forfeitability issue. But in the end, this proved to be an empty threat; the court instead adopted the government's recasting of those hours. See Sloop III, 2008 WL 678519, at *1 n.2.

1.  **Limited Success**.  The extent of success achieved by a prevailing party is "a crucial factor" in shaping a fee award. Hensley, 461 U.S. at 440.  In this context, the term "success" is multi-dimensional.  It refers among other things to an evaluation of success "claim by claim" and to an appreciation of "the relief actually achieved."  Coutin, 124 F.3d at 338.  If a prevailing party has achieved only limited success, the trial court may reduce the fee request to an amount that reasonably reflects that circumstance.  See Hensley, 461 U.S. at 440.

The method employed to calibrate the appropriate fee reduction in a case of limited success depends on the nature of the shortfall.  When, for example, a fee adjustment is intended to reflect the success or failure of claims that are themselves separate and distinct, an inquiring court may simply exclude time spent in litigating the unsuccessful claims. See Coutin, 124 F.3d at 338; cf. Aubin v. Fudala, 821 F.2d 45, 47 (1st Cir. 1987) (explaining that fees may be awarded for "interconnected" claims despite failure on some of them).  Even when a party prevails on a particular claim, however, he is only entitled to recover fees for time productively spent.  Consequently, time invested in issues that are litigated profligately, unnecessarily, or without benefit to the prevailing party may be disallowed. See, e.g., Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992); Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 952-55 (1st Cir. 1984); see also Hensley, 461

-20-

U.S. at 436-37 (explaining that an adjustment designed to reflect the scantiness of a prevailing party's recovery may take the form of a global reduction).

Here, the district court's finding of limited success hinged on two separate rationales. First, it determined that Lane had prevailed on only one issue — forfeitability — and had failed on others to which he had quixotically dedicated time and resources. See Sloop III, 2008 WL 678519, at *1. Second, it determined that Lane's ultimate recovery ($73,898.76) paled in comparison to the remuneration that he had sought throughout. See id.

We discern no abuse of discretion in the court's conclusion that Lane had achieved only limited success. Lane attempted to obtain discovery to which he was not entitled, served a subpoena on Crosby that was quashed, and ineffectually contested the applicability of sovereign immunity. Moreover, Lane raised and devoted appreciable energy to a number of valuation theories that proved to be blind alleys. Finally, Lane recovered much less than the amount he had sought (indeed, he continues to maintain on appeal, without any cogent basis, that as a matter of law the FLASH II had a value of at least $600,000).

Faced with this stark reality, Lane tries a diversionary tactic. He notes that the district court mentioned that his lowest settlement demand was $300,000. See id. He now says that evidence

-21-

of this demand was inadmissible.  See Fed. R. Evid. 408(a)(1) (prohibiting use of certain offers in compromise).  But Lane did not object below to the admission of this evidence.  To the contrary, he brought it up and referred repeatedly to it.  This was a waiver — and waived issues cannot be resurrected on appeal.  See United States v. Walker, 538 F.3d 21, 23 (1st Cir. 2008); United States v. Rodríguez, 311 F.3d 435, 437 (1st Cir. 2002).

Lane also takes umbrage at the remedy chosen by the district court to account for his limited success.  His argument in this regard rests on the premise that a district court may not deny fees relating to subsidiary issues on which the prevailing party lost so long as that party won on the overarching claim.  Noting that he prevailed on the only "claim" involved in this litigation — forfeitability — Lane insists that he is entitled to fees for litigating all the issues raised in the case.  We disagree.

A court may reduce a prevailing party's requested fees even if the party has succeeded on all or substantially all of his claims.  See Hensley, 461 U.S. at 440; Coutin, 124 F.3d at 339.  There is no rigid prescription that must be followed in effecting such a reduction.  The district court may either eliminate specific hours or reduce the overall fee to account for the prevailing party's limited success.  Hensley, 461 U.S. at 436-37.

Here, the district court chose the former route.  That court was uniquely situated to determine whether Lane's lawyers

wasted their time (and the court's) by unreasonably or unnecessarily litigating issues that were hopeless, peripheral, or otherwise extraneous. See Torres-Rivera, 524 F.3d at 336; Metro. Dist. Comm'n, 847 F.2d at 18-19; Wojtkowski v. Cade, 725 F.2d 127, 130 (1st Cir. 1984). Because the district court plausibly could have determined that efficient counsel would not have invested the time that Lane's counsel claimed to have invested in litigating marginal issues, the court acted within the wide encincture of its discretion in refusing to include any part of that time in the fee award.[8] See, e.g., Pearson v. Fair, 980 F.2d 37, 47 (1st Cir. 1992); Grendel's Den, 749 F.2d at 952-55.

**2. Grantland's Hourly Rate.** In determining the multiplier for a lodestar award — the applicable hourly rate — an inquiring court should look to "the prevailing market rates in the relevant community." Blum v. Stenson, 465 U.S. 886, 895 (1984). When a party recruits counsel from outside the vicinage of the forum court, that court may deem the "relevant community" to be the community in which the lawyer maintains his or her principal office. See Maceira v. Pagán, 698 F.2d 38, 40 (1st Cir. 1983). In

---

[8] To be sure, in holding that Lane had achieved only limited success, the lower court also referred to the disparity between damages sought and damages awarded. See Sloop III, 2008 WL 678519, at *1. While such a disparity is not a per se justification for a fee reduction, see Coutin, 124 F.3d at 340, a trial court is entitled to take it into account as part of the totality of the circumstances, see Farrar v. Hobby, 506 U.S. 103, 114-15 (1992).

-23-

that event, the court may look to the outside lawyer's actual billing practices to determine the relevant rate. See id.

Here, Grantland filed an affidavit attesting that her customary billing rate was $275 per hour, and that she had agreed to charge Lane $250 per hour. Nevertheless, because she thought that the prevailing market rate for civil rights attorneys in Boston exceeded these levels, she asserted an entitlement to compensation at $325 per hour.

The district court, citing Maceira and the fee agreement, set Grantland's base rate at $250 per hour.[9] See Sloop III, 2008 WL 678519, at *2. Lane objects, arguing that the Maceira rule should apply only when the prevailing out-of-state rate exceeds the prevailing local rate. We reject that curious construct.

In the fee-shifting context, a district court's primary concern is with the market value of counsel's services. See In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992). Thus, the rate that private counsel actually charges for her services, while not conclusive, is a reliable indicium of market value. See, e.g., Crescent Publ'g Group, Inc. v. Playboy Enters., Inc., 246 F.3d 142, 151 (2d Cir. 2001); People Who Care v. Rockford Bd. of Educ., 90 F.3d 1307, 1310 (7th Cir. 1996); Scales v. J.C. Bradford

---

[9] The court repeatedly referred to a base rate range of $250-$275 per hour. For ease in exposition, we use the lesser of these figures. Since this was only an intermediate calculation, that choice does not in any way affect our rationale.

-24-

& Co., 925 F.2d 901, 909-10 (6th Cir. 1991); Spell v. McDaniel, 824 F.2d 1380, 1402 (4th Cir. 1987); Bebchick v. Wash. Metro. Area Transit Comm'n, 805 F.2d 396, 404 (D.C. Cir. 1986). This proposition in effect allows the court to use counsel's standard rate, or the prevailing market rate in the forum, or a reasonable rate in between. This court's Maceira decision accords with this well-settled proposition.

It is true, of course, that Maceira involved an out-of-state lawyer who customarily charged an hourly rate in excess of the prevailing local rate. See 698 F.2d at 40. District court cases in this circuit applying Maceira often feature the same configuration. See, e.g., R.I. Med. Soc'y v. Whitehouse, 323 F. Supp. 2d 283, 292 (D.R.I. 2004); Libertad v. Sánchez, 134 F. Supp. 2d 218, 234-35 (D.P.R. 2001); Guckenberger v. Boston Univ., 8 F. Supp. 2d 91, 103-04 (D. Mass. 1998). But we perceive no reason why the Maceira rule must act as a one-way rachet, entitling out-of-state counsel to earn more than local attorneys but not less. Here, moreover, the base rate favored by the district court — $250 per hour — is in keeping with the rates customarily charged by civil rights practitioners in Boston during the relevant period. See Cerqueira v. Am. Airlines, Inc., 484 F. Supp. 2d 241, 250 (D. Mass. 2007) (collecting cases holding that "the prevailing rate for lead civil rights attorneys in the Boston area ranges between $200

and $350 per hour"), vacated on other grounds, 520 F.3d 1 (1st Cir. 2008).

In a related vein, Lane strives to convince us that the district court abused its discretion by considering the terms of his idiosyncratic fee arrangement with Grantland. We are not persuaded.

Although a prevailing party's fees are not necessarily limited by a preexisting agreement between lawyer and client, such an agreement is some evidence of the prevailing market rate for the lawyer's services. See Blanchard v. Bergeron, 489 U.S. 87, 93 (1989); Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 483 U.S. 711, 723 (1987). And when, as in this case, the rate agreed to between the prevailing party and his attorney is within the universe of reasonable rates, a district court does not abuse its discretion by taking the agreed rate into account in its fee-determination calculus. See, e.g., Vernon v. Port Auth. of N.Y. & N.J., 220 F. Supp. 2d 223, 230 (S.D.N.Y. 2002); Easter House v. Ill. Dep't of Children & Family Servs., 663 F. Supp. 456, 459 (N.D. Ill. 1987).

In sum, the district court did not abuse its discretion in (i) relying on Grantland's customary billing practices; (ii) taking into account the rate negotiated between Lane and Grantland for purposes of this case; or (iii) fixing Grantland's base rate at $250 per hour.

-26-

There is another chapter to this story. The district court next adjusted Grantland's rate downward to $175 per hour on the basis of "egregious overlitigation." Sloop III, 2008 WL 678519, at *2. Lane claims that this reduction constituted an abuse of discretion because the court did not simultaneously recount particular instances of overlitigation.

It is always helpful for a nisi prius court to elaborate upon its findings, and we encourage that practice. Still, no such elaboration is essential if a reviewing court can without difficulty discern the basis for the unexplained or poorly explained finding from the record. See Torres-Rivera, 524 F.3d at 337. So it is here.

The district court, citing book and verse, found that Lane had stubbornly persisted in litigating (and then losing) a cavalcade of issues. Sloop III, 2008 WL 678519, at *1. This persistent tilting at windmills provides several examples of egregious overlitigation. In addition, the court adopted the recasting contained in the government's opposition to Lane's fee application. See id. at *1 n.2. By interpolation, these recasted figures limn a great many excessive, duplicative, or otherwise unnecessary hours.

The Supreme Court has warned that ancillary litigation over fees should not be allowed to become the tail that wags the dog. See City of Burlington v. Dague, 505 U.S. 557, 566 (1992)

-27-

(discussing need to avoid "burdensome satellite litigation" to resolve fee applications).  In that spirit, the trier's fee determinations must be reasonably clear — but they need not be precise to the point of pedantry.  See Foley v. City of Lowell, 948 F.2d 10, 20 (1st Cir. 1991) (indicating that district court's findings "need not be infinitely precise, deluged with details, or even fully articulated") (citations, internal quotation marks, and alterations omitted).  Because the foundation for the district court's finding of egregious overlitigation is easily discerned, the court did not abuse its discretion by neglecting to provide a further quarry of specific examples to support that finding.

In addition, Lane accuses the district court of "double counting."  His thesis runs along the line that by eliminating time spent on losing issues and then by making a global reduction for egregious overlitigation, he has been twice penalized for the same conduct.  But that thesis does not hold together: the district court implied — and the record bears out — that Lane egregiously overlitigated the issues on which he prevailed.  For example, as we describe below, see infra Part II(B)(5), Lane spent nearly twice the amount of time that we deem reasonable litigating the default issue.  There was no double counting here.

This leaves the size of the downward adjustment.  That shrinkage — from $250 to $175 per hour — is significant but not unprecedented.  See, e.g., Maldonado v. Houstoun, 256 F.3d 181, 188

-28-

(3d Cir. 2001) (reducing fees by 50% on account of limited success); Cooke v. Stefani Mgmt. Servs., Inc., 250 F.3d 564, 570 (7th Cir. 2001) (upholding 50% limited-success reduction); Harris v. Marhoefer, 24 F.3d 16, 18-19 (9th Cir. 1994) (same); Zook v. Brown, 865 F.2d 887, 895-96 (7th Cir. 1989) (upholding 75% limited-success reduction); see also Miles v. Sampson, 675 F.2d 5, 9 (1st Cir. 1982) (confirming that court may reduce fees on account of unnecessary and duplicative work by decreasing hourly rate).[10] We descry no abuse of discretion here.

3. **The Default Judgment**. Although district courts possess broad discretion to determine appropriate attorneys' fees, they overstep that discretion when they rely on an improper factor. See Coutin, 124 F.3d at 341. Here, the district court disallowed two-thirds of the fees related to the vacation of the default judgment due to Lane's perceived lack of diligence in seeking to intervene in the forfeiture proceeding. Sloop III, 2008 WL 678519, at *1. Disallowing fees on this basis is in tension with our pre-remand holding that, regardless of Lane's knowledge of the seizure, the government had an unflagging obligation to take reasonable steps to identify the owners of the FLASH II and provide them with

---

[10] While it is permissible to use a rate reduction as a method of accounting for an extravagant commitment of time, we suggested in Miles, 675 F.2d at 9, and today reaffirm, that this is not the preferred methodology. Reducing hours is generally a more effective antidote to cure excess time.

-29-

specific notice of the forfeiture proceeding itself. <u>Sloop I</u>, 458 F.3d at 25.

On remand, the district court found that the government had failed to take reasonable steps to identify and locate Lane. <u>Sloop II</u>, 517 F. Supp. 2d at 549. Accordingly, it granted Lane's motion to vacate the default judgment of forfeiture. <u>Id.</u> This finding leads to the inevitable conclusion that, had the government complied with its constitutional obligation to provide adequate notice, there would have been no need to litigate the propriety of the default judgment. Thus, even though Lane might have come forward to make a claim earlier, we see no compelling reason either to lighten the government's constitutional burden or to ease the consequences of its constitutional breach. <u>Cf.</u> <u>United States</u> v. <u>Harrigan</u>, 557 F.2d 879, 884 (1st Cir. 1977) ("If this statutory duty is to have any practical significance, we think it is necessary to attach consequences to its violation which discourage abuse and which protect against resulting injury.") (citation and internal quotation marks omitted).

The government argues that a footnote in our earlier opinion left open the possibility that Lane would bear the brunt of his failure to act more expeditiously. <u>See</u> <u>Sloop I</u>, 458 F.3d at 25 n.10 (suggesting that Lane's failure to make the government aware of his interest before the entry of default was "not necessarily irrelevant to the final outcome of the Rule 60(b) motion," since

that failure might inform equitable considerations pertinent to Rule 60(b) relief). The government reads this footnote through rose-colored glasses.

The footnote cannot be construed to suggest that Lane's failure to come forward earlier could shift to him responsibility for the litigation needed to test the propriety of the default judgment. In other words, once the court below had determined that Lane was entitled to relief despite his failure to make his identity known sooner and had vacated the default, the conclusion became inevitable that the government was to blame for the litigation surrounding the default judgment. Under these circumstances, it was an abuse of discretion for the court to reduce the fee award based on Lane's procrastination. Cf. Coutin, 124 F.3d at 341-42 (explaining that a district court may not reduce attorneys' fees "to assuage lingering doubts about the legal viability of [a successful] claim").

4. **Goldberg's Hours**. The district court disallowed all fees attributable to Lane's other lawyer, Eric Goldberg. Sloop III, 2008 WL 678519, at *1. Goldberg's time seems to have focused mainly on vacation of the default judgment. The records give us little insight, however, into why Goldberg's time should be considered productively spent. It is not clear that Goldberg worked successfully on any issue not also fully addressed by Grantland. Indeed, there is nothing to indicate that Lane may have

-31-

needed a second lawyer to handle a case on which Grantland spent so many hours.

Lane does little to resolve this quandary. While he mentions the disallowance of Goldberg's time on two occasions in his opening brief, he fails to develop a meaningful rationale either for why Goldberg's involvement was necessary or for why jettisoning Goldberg's hours constituted error. As such, we believe that Lane can fairly be said to have abandoned his objection to the disallowance of Goldberg's fees. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

At any rate, overstaffing is a familiar problem in cases in which fee-shifting is in prospect. See, e.g., Pearson, 980 F.2d at 47; Metro. Dist. Comm'n, 847 F.2d at 18-19; Grendel's Den, 749 F.2d at 953. Goldberg's work, taken at face value, appears to mimic portions of Grantland's work; and there is absolutely nothing in the record that suggests a legitimate need for a second attorney. Thus, refusing to allow Lane to claim time for both Goldberg and Grantland on apparently overlapping work appears to be an appropriate exercise of the district court's discretion.

To sum up, although the district court was not explicit, the record supports a reasonable inference that Goldberg's work duplicated portions of Grantland's work. The government suggested that Goldberg's time should be disregarded on that theory, and we can assume that the district court bought into that suggestion.

See Sloop III, 2008 WL 678519, at *1 n.2 (adopting government's calculation of hours reasonably expended). That was not an abuse of discretion. Grendel's Den, 749 F.2d at 950 (indicating that court should eliminate hours that are "duplicative, unproductive, excessive, or otherwise unnecessary").

     **5. Reconciliation.** To recapitulate, we have determined that the court below erred in only one respect. Because this error requires recalculation of the fee award, we ordinarily would remand for that purpose. We have, however, eschewed a remand in some cases in which the recalculation can be performed by this court. See, e.g., Gay Officers Action League, 247 F.3d at 299; Lipsett, 975 F.2d at 943. In this instance, we elect to follow the latter course.

     The solitary error that taints the fee award concerns the district court's across-the-board disallowance of two-thirds of the time that Grantland claims to have spent in litigating the default judgment. See supra Part II(B)(3). Grantland lists a total of 223.25 hours relating to that aspect of the litigation. The district court cut this time to 74.42 hours — but it used an impermissible factor to justify that reduction.

     This does not mean, however, that Lane is automatically entitled to restoration of the full 148.83 hours that the district court cut. In an effort to isolate time productively spent, we have examined Grantland's time sheets in light of the record. That

examination persuades us to adjust the time spent litigating the propriety of the default judgment to 145 hours. We believe that this is the maximum amount of time that a reasonably efficient lawyer would have spent in litigating this issue.

This determination brings the total number of compensable hours in the case to 307.2. Multiplying that number by the hourly rate that the district court supportably assigned to Grantland, see supra Part II(B)(2), we arrive at an overall fee award of $53,760, exclusive of expenses. Lane is also entitled to recover the sum of $7,117.50, which represents the district court's assessment of the fair market value of the work performed by Grantland's paralegal (Osburn).

The district court also reduced the expenses incurred in connection with litigating the default judgment by two-thirds. We restore that cut ($1,030.61) in full. Doing so brings Lane's recoverable expenses to $4,434.74.

These computations yield a total of $65,312.24 in fees and expenses. The fee award should be increased to this amount.

## III.  CONCLUSION

We need go no further. To the extent that Lane has made other arguments, they are plainly meritless, insufficiently developed, or both. We reject them out of hand.

For the reasons elucidated above, we affirm the judgment awarding Lane $73,898.76 in damages; order modification of the

ancillary fee award to $65,312.24; and affirm that award as modified.  Interest shall accrue on these amounts as provided by 28 U.S.C. § 1961.  No fees, expenses, or costs shall be taxed for services rendered in connection with this appeal.

**So Ordered**.